**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| INCLUSIVE LOUISIANA and THE DESCENDANTS PROJECT, <br><br> *Plaintiffs,* <br><br> *vs.* <br><br><br> FG LA, LLC, a/k/a FORMOSA PLASTICS, <br><br> *Defendant.* | Civil Action <br><br> Judge <br><br> Magistrate |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

NATURE OF THIS ACTION ............................................................................................... 4

JURISDICTION AND VENUE .............................................................................................. 4

PARTIES ............................................................................................................................... 5

STATEMENT OF FACTS .................................................................................................... 6

    A.    In St. James Parish, Chattel Slavery was a Death-Making Institution that Denied
    Dignity to the Enslaved, Even in Death. .......................................................................... 6

    B.    Simon, Betsy, Rachel, Stanley, and Harry: Enslaved on Buena Vista and Used
    as Collateral Even After Their Deaths .......................................................................... 10

    C.    Disregard for the Burial Sites of Enslaved People, and their Descendants,
    Has Persisted ................................................................................................................. 13

    D.    Formosa's Conduct Threatens Access to and Care, Maintenance, and Protection
    of the Buena Vista Cemetery Site, and the Right of Those Buried and the Descendant
    Community to be Free of the Badges and Incidents of Slavery. ..................................... 15

    E.    Plaintiffs Wish to Remove the Mark of Slavery, Properly Honor   the Deceased,
    and Preserve and Foster Their Cultural Origins ......................................................... 27

CLAIMS FOR RELIEF ....................................................................................................... 30

    CLAIM I: THIRTEENTH AMENDMENT ....................................................................... 30

    CLAIM II: LOUISIANA CEMETERY DEDICATION LAW ........................................... 32

RELIEF REQUESTED ........................................................................................................ 34

NOW, INTO COURT, through undersigned counsel, come Plaintiffs Inclusive Louisiana (hereinafter "Inclusive Louisiana" or "Inclusive") and The Descendants Project, who bring this action for declaratory and injunctive relief against Defendant FG LA LLC a/k/a Formosa Plastics (hereinafter "Formosa Plastics," or "Formosa") and who, in support thereof, allege as follows:

## PRELIMINARY STATEMENT

1.      This case concerns the final resting place of people who were enslaved on a plantation in St. James Parish, Louisiana, and what the law, in fairness and justice, requires for the care and preservation of their graves, the sacred site of their burials, and for their descendants.

2.      Plaintiffs are organizations founded by and serving the descendant community of enslaved people who forcibly worked and died on plantations in the parishes along the Mississippi River in Louisiana under the cruel and inhumane system of slavery in the U.S. South. That system included the trafficking and leasing of enslaved people, routinely separating families across plantations. Thus living members of the descendant community of the River Parish plantations, including Inclusive's members and the local residents served by The Descendants Project, have ancestral ties to many, if not all, of the plantations that operated along the Mississippi River.

3.      Plaintiffs bring this action to protect, care for, and preserve the final resting places of the people who were enslaved and died on the Buena Vista Plantation in St. James Parish, Louisiana.

4.      When Defendant Formosa Plastics purchased the land on which these graves are located in 2017, it also purchased the bodies of the people who were enslaved, worked to their death, and buried on that land in what is now called the Buena Vista Plantation Cemetery.

5.      Given the history of slavery and the nature of its operation on sugarcane

plantations, multiple cemeteries like Buena Vista exist along the Mississippi River throughout St. James Parish, where people who were enslaved and who died during their enslavement are buried.

6.      As detailed herein, many of these resting places have already been damaged or destroyed through heavy industrial development.

7.      Indeed, a pipeline that runs through the Buena Vista Plantation Cemetery, has desecrated and damaged–if not destroyed altogether–some of the graves in the Cemetery.

8.      Where burial sites have not been damaged or destroyed in Louisiana, members of descendant communities of the River Parishes, including Inclusive's members and local residents served by The Descendants Project, have frequently been denied the right to access, maintain, care for, and protect these cemeteries.

9.      Since at least August 2018, Formosa has known of the graves in the Buena Vista Plantation Cemetery.

10.      At that time, Formosa's land use application for this site was still pending before St. James Parish, but Formosa did not notify community residents, including Inclusive's members and other local descendant community members served by The Descendants Project, or parish officials of its knowledge of the graves.

11.      After community residents and organizations, including some of Plaintiff Inclusive's members, learned of the graves through public records requests to Louisiana's Division of Archaeology over a year later – and after Defendant's land use application had already been approved by the Parish – community residents began visiting the Buena Vista Plantation Cemetery to pray and to honor their enslaved ancestors.

12.      As detailed below, when community residents, including Plaintiff Inclusive's members, visited the Buena Vista Plantation Cemetery for prayer and memorial, Formosa

2

began threatening them with arrest, and subsequently also refused their request in advance to visit the graves to commemorate Juneteenth in 2020.

13. Local descendant community members were forced to go to court in June 2020 to obtain a court order allowing them to visit the site.

14. Since being ordered by a state court to allow access to the Cemetery, Formosa has done so begrudgingly, making Plaintiffs' and the descendant community's access to the site increasingly difficult. Formosa has placed onerous burdens and limitations on their access – surveilling, and even interrupting, their services, in addition to failing to properly maintain a road to access the Cemetery.

15. As a result, Plaintiffs and living members of the descendant community of the River Parish plantations find themselves in the same circumstance as previous generations since the Civil War: their ancestors were forced to live, work, and die on plantations they could not leave, and now that land – including those burial sites – has become land they are not allowed to enter without permission. Like the generations before them, Plaintiffs have been denied permission to visit, mark and maintain the final resting places of their ancestors, to honor and dignify their dead.

16. Consistent with their organizational missions, Plaintiffs Inclusive Louisiana and The Descendants Project wish to honor the deceased enslaved persons who are buried at the Buena Vista site, to render them visible, and bring dignity to their final resting places, too long disrespected by an irreverent history.

17. Louisiana cemetery dedication law requires that they be allowed to do so as it grants Inclusive's members and The Descendants Project rights to access, maintain, care for, and protect the Buena Vista Plantation Cemetery.

18. The Thirteenth Amendment of the U.S. Constitution requires that they be

3

allowed to do so.

19.     The Thirteenth Amendment also requires that Plaintiffs' rights to access and care for cemeteries as applied must account for the particular history of graves of enslaved people, whose burials were not afforded the recordation, memorial, protection, reverence, and care to which their enslavers and other free persons have always been entitled, and whose bodies were, and continue to be, owned in death as part of the land.

20.     It further requires a particular attention to and regard for the value and meaning of these sacred, endangered sites for living descendants.

## NATURE OF THIS ACTION

21.     This is an action to enforce rights to access, maintain, care for, and protect a cemetery under cemetery dedication law in Louisiana and to eradicate one of the "lingering vestiges of the slave system" pursuant to the Thirteenth Amendment of the United States Constitution – the continued ownership and control of the bodies of those enslaved under the slavery system.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over these claims pursuant to 28 U.S.C. Sec. 1331, 1343, 1367, 2201, 2202, and 42 U.S.C. Sec. 1985 and 1988. This Court also has jurisdiction under 28 U.S.C. Sec. 1332 because there is diversity of citizenship among the parties and the amount in controversy exceeds $75,000.00.

23.     Venue is proper in this District under 28 U.S.C. Sec. 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred herein, and a substantial part of property that is the subject of the action is situated herein.

4

**PARTIES**

24.     Plaintiff INCLUSIVE LOUISIANA ("Inclusive") is a faith-based, grassroots organization founded by lifelong residents of St. James Parish with a mission to spread "enlightenment and hope" to "create a fairer and more inclusive society" and a vision to "educate and inform the community about social, racial, and environmental justice along with [] civic responsibilities."

25.     The founders of Inclusive are themselves descendants of people enslaved on plantations that operated in St. James Parish, and have long visited, tended to, and cared for cemeteries where some of their family members and ancestors are buried. Inclusive members have visited the Buena Vista Plantation Cemetery since it was discovered on Defendant's property to pray, sing, and report on why such sites are so significant for their community, including participating on June 19, 2020, in a Juneteenth commemorative prayer event.

26.     Inclusive members wish to continue to visit and maintain, care for, and protect the Cemetery, to pray and reflect at the gravesite, and honor the dead who are buried there.

27.     Plaintiff THE DESCENDANTS PROJECT is an organization based in Wallace, Louisiana, committed to the intergenerational healing and flourishing of the Black descendant community in the Louisiana River Parishes.

28.     The co-founders, Jo and Joy Banner, are lifelong residents of Wallace and are descended from people enslaved and forced to labor in plantations that line the Mississippi River, including in St. James Parish. Through programming, education, advocacy, and outreach, The Descendants Project aims to preserve, foster, and promote the cultural origins of descendants of the enslaved in the River Parishes; and champion the voice of the Black descendant community while demanding action that supports the total health and well-being of Black descendants in the River Parishes.

5

29. Through their work, The Descendants Project is committed to reversing the harms of slavery through healing and restorative work and, in furtherance of that, has worked to identify and protect other cemeteries, burial grounds, and sacred cultural sites under threat in the River Parishes, including sites threatened by industrial development of land that was once also owned by Defendant. In the course of this work they have worked with archaeologists, anthropologists, genealogists, and researchers and investigators with expertise in cultural history, including local history, and forensic investigation.

30. The Descendants Project has also visited the Buena Vista Plantation Cemetery and partnered with Inclusive Louisiana in commemorative programming at the site. The Descendants Project wishes to continue to visit and maintain, care for, and protect the Cemetery to pray and reflect at the gravesite and honor the ancestors who are buried there.

31. Defendant FG LA, LLC, (hereinafter "Formosa Plastics" or "Formosa") is a member of Formosa Plastics Group, a Taiwan-based conglomerate, that owns the property located in St. James Parish where the Buena Vista Plantation Cemetery is located and possibly other cemeteries where people enslaved on adjacent plantations are interred.

<strong>STATEMENT OF FACTS</strong>

**A.    In St. James Parish, Chattel Slavery was a Death-Making Institution that Denied Dignity to the Enslaved, Even in Death.**

32. Before the Civil War, St. James Parish, like other parishes along the Mississippi River, was home to numerous sugar plantations where a brutal and deadly form of chattel slavery was enforced.

33. Historic mortality records reveal just how deadly this form of slavery was. As compared to the rest of the slaveholding areas in the United States, Louisiana's sugar plantations were the only area where slavery existed with a negative birth rate among the

6

enslaved population.[1]

34.   The average age of death for enslaved people in St. James Parish between 1850-1860 was 21.4 years old.[2]

35.   The death rate for children up to ten years of age was notably and tragically high, as was the percentage of mothers who died in childbirth.[3]

36.   In 1850, the population of enslaved people in St. James Parish was 7,751;[4] that year at least 194 enslaved people died.

37.   In the decades before the Civil War, enslavers had consolidated land into increasingly large plantations, mostly for sugarcane farming. As the plantations grew in size, so did the number of people enslaved on them. By the time the Civil War began in 1861, the majority of people in the Parish were enslaved people.[5]

38.   Thus, burials of enslaved people on these plantations were common.

39.   Louisiana's chief archaeologist, Dr. Chip McGimsey, has stated, "with almost 100% certainty" that there is "going to be a slave cemetery" on "every plantation that existed."[6]

---

[1] *See* Richard Follett, *'Life of Living Death:' The Reproductive Lives of Slave Women in the Cane World of Louisiana*, Vol. 26, No. 2, August 2005, pp. 289-304; *see also*, *Slavery in Louisiana: The Whitney Plantation*, The Whitney Plantation, https://www.whitneyplantation.org/history/slavery-in-louisiana/ (March 18, 2023).

[2] Don Hunter and Joanne Ryan, *Who's Buried at Buena Vista? An Unmarked Plantation Cemetery in St. James Parish, Louisiana: History, Genealogy, and Mortality Demographics* (2022) at 109.

[3] Id.

[4] Louisiana Census (1850). *Enslaved people comprised 70% of the parish's total population of 11,098 people*. https://www2.census.gov/library/publications/decennial/1850/1850a/1850a-35.pdf.

[5] *See* Christopher Goodwin & Associates, Inc. *Phase I Cultural Resources Survey and Archeological Inventory of the Proposed Boardwalk Louisiana Midstream, LLC, 56.2 KM (34.9 mi) Formosa Pipeline Project in Iberville, Ascension, and St. James Parishes* (June 2019).

[6] Charisse Gibson, *Who Benefits from the petrochemical industry in St. James Parish?*, WWL TV CBS, Feb. 14, 2020, available at https://www.wwltv.com/article/news/local/who-benefits-from-the-petrochemical-industry-instjames-parish/289-e41c3adb-0a11-47c4-b28e-dcfc2bc230e6.

According to McGimsey, this is particularly so because "child mortality rates in those days was very high" and as a result he would "expect that most plantations are going to have *[sic]* cemetery of some size, somewhere on their property."[7]

40.    Integral to the broader strategy of domination, violence, and dehumanization inherent in the slavery system, was the deprivation of human dignity even in death, as enslaved people could not choose where they would be buried, nor how.

41.    Enslaved people from this period through Emancipation were generally not buried in church cemeteries. Instead, they were buried on uncultivated land within the plantation where they were enslaved that was designated for burying enslaved people. This practice continued through French and Spanish rule, and after the transfer of the territory to the United States.

42.    The 1685 Code Noir, first decreed for the Caribbean and then applied to Louisiana, forced Catholic, Apostolic, or Roman religion on enslaved people.[8] The 1724 Code Noir, which remained largely in effect under subsequent Spanish rule, added to this requirement that "[m]asters shall have their Christian slaves buried in consecrated ground."[9]

43.    One of the many indignities and horrors of slavery for enslaved people and for their descendants in the Parish is that burials of enslaved people were not routinely recorded, marked, or venerated.

44.    Individual deaths were not documented in writing, in public records, or physically through headstones or other obvious grave markers.

---

[7] Testimony of Dr. Charles McGimsey in The Descendants Project v. St. John the Baptist Parish, 40th Judicial District Court, Case No. C-77305, p. 59:1-5.
[8] 1685 Code Noir, art. XIV, available at: https://www.nps.gov/articles/000/transcription-of-the-code-noir-the-black-code.htm.
[9] 1724 Code Noir, arts. I, II, V, XI, available at https://www.loc.gov/item/2021667007. Translation available at: https://www.nps.gov/articles/000/transcription-of-the-code-noir-the-black-code.htm.

45.     Descendants were forbidden by law and custom from gathering to engage in religious and spiritual practices at these burial sites to honor, pray, and pay their respects to their ancestors.[10]

46.     While enslaved people were generally buried on uncultivated land in the back of the plantation, further away from the Mississippi River and in or at the edge of the forest, plantation owners were generally buried in marked graves in church cemeteries or in family plots.

47.     In addition to their burial sites being marked with headstones, the deaths of enslavers were officially recorded in church and state records.

48.     That system of recording and recognition has made it easier for descendants of plantation owners to access, maintain, and care for the burial sites of their loved ones, unlike descendants of enslaved people who are impeded by the lack of traditional grave markers, lack of written documentation of death, and private ownership of burial sites by non-descendants like Formosa.

49.     Indeed, consultants hired by Formosa were able to confirm that "none of the previous owners are buried at the plantation" because "they are buried in various locations in St. James, Assumption, and Orleans Parishes" and their precise burial sites were located using the Find-a-Grave website.[11]

---

[10] *Id.* art. XIII (Prohibiting the "gather[ing] in crowds either by day or by night, under the pretext of a wedding, or for any other cause" of "slaves belonging to different masters."); 1806 Black Code of Louisiana, June 7, 1806, Sec. 12, available at https://www.accessible-archives.com/2011/08/the-black-code-of-louisiana-1806 (Prohibiting any slaveowner from "suffer[ing] on his plantation assemblies of any slaves but his own…").

[11] TerraXplorations, Inc., Final Report: Archaeological Monitoring and Mechanical Stripping of the Acadia and Buena Vista Cemeteries, St. James Parish, Louisiana, June 2019, p. 17-18, 55 (Attachment D annexed to Letter from Center for Constitutional Rights to St. James Parish Council, December 23, 2019) available at https://ccrjustice.org/sites/default/files/attach/2019/12/RISE%20St.%20James%20DEQ%20Comments%20Dec.%2018%20%20w%20attachments.pdf.

**B.    Simon, Betsy, Rachel, Stanley, and Harry: Enslaved on Buena Vista and Used as Collateral Even After Their Deaths.**

50.    Despite these historic impediments and indignities, the names of five of the people who were enslaved, and who lived and died on the Buena Vista Plantation are now known.

51.    Inclusive Louisiana and Louisiana Bucket Brigade, moved by oral histories passed down through Inclusive members through generations, looked for additional information about the Cemetery and those buried in it.

52.    Lenora Gobert, expert in genealogy and family history research, performed research to find the names of the enslaved people buried in the Buena Vista Plantation Cemetery which revealed the names of five of the many people who were enslaved on the plantation[12]

53.    Their names were Simon, Betsy, Rachel, Stanley, and Harry.

54.    Gobert was able to find their names because their bodies were mortgaged in financial transactions by Benjamin Winchester to secure wealth for himself, even after they died. The mortgage documents indicated they died while enslaved by Winchester, indicating they are among those buried on the plantation.

55.    Death did not free them from ownership or from the use of their bodies for financial gain.

56.    In October 2024, Inclusive Louisiana and Louisiana Bucket Brigade, published a report that introduced Simon, Betsy, Rachel, Stanley, and Harry to the world.

---

[12] *See* Lenora Gobert, "Buried at Buena Vista: The Untold Stories of Five Enslaved People," Louisiana Bucket Brigade, 2024.

## Simon

57. Simon came to be the legal property of Benjamin Winchester on October 4, 1821, as a "gift" to Winchester from Winchester's mother. He was 10 years old.

58. During his lifetime and after his death, he was mortgaged by Winchester at least six times. He remained enslaved on the Buena Vista Plantation until his death, at which time his age was recorded as 23 and 25 in various records.

## Betsy

59. Betsy came to be the legal property of Benjamin Winchester when he bought fourteen people from a Tennessee enslaver on February 12, 1823. She was 6 years old.

60. During her lifetime and after her death at age 18, she was mortgaged by Winchester at least seven times.

## Rachel

61. Rachel came to be the legal property of Benjamin Winchester at 4 years old on March 4, 1828, when she was purchased alongside her mother, who was 20 years old, and her brothers, who were 2 years old and 1 year old, respectively.

62. Rachel died before her tenth birthday. During her very short life and after her death, she was mortgaged by Winchester at least five times.

## Stanley

63. Stanley came to be the legal property of Benjamin Winchester on March 4, 1828, in the same transaction as Rachel and her family. He was 26 or 27 years old.

64. Six years later, Stanley was dead. During his lifetime and after his death, he was mortgaged by Winchester at least six times.

**Harry**

65.     Harry is the fifth enslaved person known to be buried in the Buena Vista Plantation Cemetery. In the mortgage documents through which Benjamin Winchester used Harry to enrich himself, Harry's birth is recorded on different dates, a further sign of the lack of regard for and dehumanization of enslaved people.

66.     He died at the age of 18.

67.     On February 27, 1832, Harry was mortgaged by Winchester despite being recorded as "dead."

68.     Due to the horrific nature of enslavement, it has been difficult to learn anything about the day-to-day lives, hopes, and dreams of Simon, Betsy, Rachel, Stanley, Harry, and the other people enslaved and buried in the Cemetery, which is, in part, why this Cemetery is invaluable and a treasured site for the Plaintiffs as they engage in research and educational work to learn and share more about their ancestors' lives that have been hidden due to enslavement, to ensure understanding and respect for their memory, and for the thriving of descendants.

69.     At least two things are known, however: Simon, Betsy, Rachel, Stanley, and Harry were enslaved on the Buena Vista Plantation; their presence in Winchester's financial transactions after death indicates that they were buried in unmarked graves in the Buena Vista Plantation Cemetery.

70.     Plaintiffs believe that the memory of their lives and the lives of countless other unnamed enslaved persons must be honored.

71.     Plaintiff Inclusive Louisiana commissioned headstones to honor them and mark their final resting place, and a sixth headstone for all those who remain unknown.

12



Photograph of three of the headstones commissioned by Plaintiff Inclusive Louisiana to mark the final resting place of those enslaved on the Buena Vista Plantation whose names have been confirmed, and one for all the people buried there who remain unknown.

### C.   Disregard for the Burial Sites of Enslaved People, and their Descendants, Has Persisted.

72.   As indicated in the report of Formosa's archaeologist, the lack of headstones at the burial sites was a feature of slavery and one of the ways that the injuries of slavery, including dehumanization, extended into death for enslaved people and their descendants by removing any indicators of their individual lives, family, and existence.

73.   Indeed, the absence of grave markers in the Buena Vista Plantation Cemetery is why Formosa's archaeologist believed that those burial grounds would be the final resting place of people who died while enslaved on the plantation.

74.   Although the deaths of enslaved individuals were not recorded on paper, nor through headstones, their loved ones did sometimes plant trees or find other ways to mark gravesites.

75.   Over the years, these cemeteries would also have been avoided by laborers or farmers who knew that graves were located there.

76.   In this way, some cemeteries were preserved and eventually grew to become

13

clusters of trees on tracts of land that are otherwise flat. Some of these clusters persisted for decades or even centuries; some still remain today.

77. These are clues left behind for descendant communities rediscovering their connection to ancestors – connections that continue to be threatened by the legacy and enduring badges of slavery that carry to this day.

78. While enslaved people were prevented from leaving plantations to bury the dead where they chose, their descendants, after gaining freedom from slavery, were conversely prevented from entering the land where their enslaved ancestors were buried to consecrate, commemorate, and honor them.

79. The Black Codes established in 1865 outlawed trespassing on plantations, which was "intended to prevent freedmen from leaving the plantations on which they are employed, and from visiting each other…."[13]

80. And like their enslaved ancestors before them, freedpeople were also often prevented from gathering to exercise their right to religion.

81. Descendants of the enslaved in St. James Parish have continued to face impediments to accessing and caring for the burial sites of their ancestors, including on former plantation lands now owned by Formosa.

82. These harms have been exacerbated by the destruction and desecration of some of these cemeteries as a result of industrial development in areas of the parish that were once the site of these plantations that used enslaved labor.

83. Inclusive has discovered that this industrial development has already destroyed

---

[13] Report of Ex-governor Hahn on Louisiana Legislation Relating to Freedmen, April 12, 1866, available at:
https://archive.org/details/exgovernorhahnon00hahn/page/n5/mode/2up?q=apprentice; *see also*, Du Bois, supra n. 16 at 168.

and/or damaged, and thereby desecrated, cemeteries where enslaved people were buried, including on the property now owned by Formosa.[14]

84. Continued forced separation from their families' burial plots and the inability to freely connect with, consecrate, commemorate, and honor them at their gravesites is one of the enduring harms of slavery still felt today by Inclusive's members and other descendants.

85. This runs afoul of Louisiana jurisprudence which permits access to isolated cemeteries, like the Buena Vista Plantation Cemetery, that lie within the property of another.

**D. Formosa's Conduct Threatens Access to and Care, Maintenance, and Protection of the Buena Vista Cemetery Site, and the Right of Those Buried and the Descendant Community to be Free of the Badges and Incidents of Slavery.**

**i. The Formosa Site Includes the Buena Vista Plantation Cemetery and the Acadia Plantation Cemetery.**

86. Since the 1960s, St. James Parish has prioritized heavy industrial development in areas of the parish that were once the site of the plantations that used enslaved labor.

87. This development has resulted in the destruction and desecration of gravesites where enslaved people were buried on these plantations.

88. In 2017, Formosa purchased the property, which consisted of 2,375 acres of open field, on which the Buena Vista Cemetery is located.

89. On October 30, 2018, the St. James Parish Planning Commission approved Formosa's land use application to build a massive plastics complex on the property.

90. Community members appealed the Planning Commission's decision, and on January 23, 2019, the St. James Parish Council denied their appeal and let the Commission's

---

[14] Inclusive has also learned that a calcined coke plant (now owned by Atlantic Alumina) built on the former Sports Place Plantation, and a retention pond (now owned by Mosaic Faustina) built on top of the Lauderdale Plantation has desecrated other cemeteries of enslaved people.

approval of Formosa's land use application stand.

91.    Inclusive's members have long believed that there are cemeteries of enslaved people at the Formosa site, based on oral history passed down in the community of descendants of those enslaved on plantations in St. James Parish.

92.    In November 2019, Inclusive's counsel sent a public records request regarding the Formosa project site to the Louisiana Division of Archaeology to determine if there were any confirmed gravesites on the property.

93.    Through these record requests, it was discovered that in 2018, the Louisiana Division of Archaeology was alerted by an independent archaeologist about an 1878 map that showed the locations of two cemeteries on Formosa's land – the Acadia and Buena Vista Plantation cemeteries.

94.    The Division of Archaeology then required Formosa to undertake additional site investigations.

95.    These records showed that Formosa was aware of the existence of these gravesites as early as August 2018 while its land use application was still pending with the Parish.

96.    Formosa did not inform community residents or the Parish government of its awareness of the existence of these grave sites.

97.    The records and subsequent investigation revealed that the Formosa site is located on several former plantations, including the Buena Vista/Winchester plantation, the Acadia plantation, and the Elina plantation.

### ii. People Were Enslaved by the Winchesters and the Mires on the Buena Vista and Acadia Plantations, and Cartographic Regression Analysis Reveals Cemeteries on those Plantations.

98.    The Buena Vista/Winchester plantation was owned by the Winchester family

for four decades, beginning as early as 1818 when Benjamin Landry Winchester bought the first tracts of land that would make up the plantation.[15]

99.     The Winchesters were large-scale sugar producers and needed a large labor force to accomplish this work.

100.    In the 1820s, Benjamin Winchester began to build this labor force by purchasing people to be enslaved on the plantation.

101.    By 1830, the Winchesters were enslaving 82 people. By 1860, that number had grown to over 200.

102.    Included in these numbers were Simon, Betsy, Rachel, Stanley, and Harry.

103.    In 1866, there were 120 freedpeople working on the Winchester plantation.[16]

104.    A map from 1878 shows a cemetery on the Winchester plantation within the Formosa project site.[17]

105.    Subsequent aerial photographs from 1940 until 1971 show a cluster of trees located at the site of the cemetery, suggesting that it was being maintained (and potentially used) until then.[18]

106.    By 1978, the trees had been removed and the site plowed for agriculture.

107.    The Acadia Plantation was owned by the Mire family, who, in 1830, enslaved 29 people.[19] The family had entered sugarcane production by the 1843-1844 growing season,

---

[15] Don Hunter and Joanne Ryan, *Who's Buried at Buena Vista? An Unmarked Plantation Cemetery in St. James Parish, Louisiana: History, Genealogy, and Mortality Demographics*, 3 (2022).

[16] *Id*. at 15-17.

[17] Coastal Environments, Inc., *Cartographic Regression Analysis of certain Tracts of Land Located in T. 11 S and T. 12 S., R. 15 E. (Southeastern Land District West of the Mississippi River), St. James Parish, Louisiana*, 72 (Feb. 19, 2020), available at: https://ccrjustice.org/sites/default/files/attach/2020/03/St.%20James%20Cemeteries%20%28Reduced%29%20%281%29.pdf.

[18] *Id*. at 73-86.

[19] *See id*. at 9.

which required additional labor, so by 1860, the number of people enslaved by the Mire family had grown to 149. In 1865, there were 33 freedpeople working on the plantation.

108.    A map from 1878 shows a cemetery on the Acadia plantation, within the Formosa project site.[20] Subsequent aerial imagery from 1940 to 1971 show a cluster of trees located at the site of the cemetery, suggesting that it was maintained (and potentially used) until then.[21]

### iii. After Being Alerted to the Existence of These Cemeteries, Formosa Did Not Inform Parish Officials and the Community, and Made Plans to Remove the Cemeteries.

109.    The records obtained from the Division of Archaeology included a series of communications between the Division and Formosa's consultants that showed that Formosa was aware of the likely presence of cemeteries on its property in St. James as early as August 2018.

110.    After the Division of Archaeology received the information from the independent archaeologist that the Buena Vista and Acadia Plantation Cemeteries were on the Formosa property, the Division required Formosa to undertake further site investigations.

111.    Also in August 2018, Formosa's attorneys informed the Louisiana Attorney General's office and Division of Archaeology that if human remains were found on the Acadia site, they would choose to remove them because they would interfere with Formosa's construction plans.

112.    By October 25, 2018, a subsequent  site investigation by Formosa's archaeologists confirmed the existence of the Buena Vista Plantation Cemetery on its property.

113.    This investigation also noted that a pipeline had been previously constructed

---

[20] *Id.* at 18.
[21] *Id.* at 20.

through parts of the property, including the Buena Vista Plantation Cemetery.

114.    In October 2018, Formosa proposed to the Division of Archaeology that the Cemetery be fenced off at that time.

115.    The Cemetery is now marked off by a three-sided chain-link fence with barbed wire.

116.    But records from the Division of Archaeology also revealed that as late as November and December 2019 Formosa was seriously considering removing the graves from the Buena Vista Plantation Cemetery.

117.    Formosa has not undertaken any other activity to preserve the Cemetery.

118.    As for the Acadia portion of the property, Formosa's archaeologists reported that the Acadia cemetery had likely been destroyed by the "borrow pit" that had been dug out by a previous landowner.

119.    Formosa did not inform the Parish government nor community members of the existence of the cemeteries or its plans, even though its land use application was pending with the Parish at the time.

120.    In May 2019, out of concerns that Formosa's site investigation may not have accurately pinpointed the location and extent of either of the cemeteries, the Division of Archaeology issued permits to conduct additional investigation.

121.    In the resultant June 2019 report, the lead author reported that their team believed, based on field and archival research, that the Buena Vista Plantation Cemetery likely held the remains of people enslaved on the plantation.[22]

---

[22] TerraXplorations, Inc., Final Report: Archaeological Monitoring and Mechanical Stripping of the Acadia and Buena Vista Cemeteries, St. James Parish, Louisiana, June 2019 (Attachment D annexed to Letter from Center for Constitutional Rights to St. James Parish Council, December 23, 2019) available at

19

122.    This conclusion was based on how the Cemetery's location on a plantation and lack of markers overlapped with the history of forced, markerless burials of enslaved people on the plantations where they died.

123.    However, this study did not do any archaeological excavations related to the Buena Vista Plantation Cemetery.

124.    Rather than doing any further investigation, this area was fenced off.[23]

125.    The independent archaeologist who first discovered the burial sites later undertook a fuller assessment and report, which was submitted to the Louisiana Division of Archaeology.

126.    That report included details about as many as five additional cemeteries on the same site.

127.    Once the information about the existence of the cemeteries became public, Formosa began to question the findings and opinions of its own consultants as to who is likely buried in the Buena Vista Plantation Cemetery.

128.    Since Formosa's knowledge of the Buena Vista Plantation Cemetery came to public light, Formosa has denied descendant communities access to the site on multiple occasions.

129.    Since Formosa's knowledge of the Buena Vista Plantation Cemetery came to public light, Formosa has refused permission to place headstones in the Cemetery for Simon, Betsy, Rachel, Stanley, and Harry.

---

https://ccrjustice.org/sites/default/files/attach/2019/12/RISE%20St.%20James%20DEQ%20Comments%20Dec.%2018%20%20w%20attachments.pdf.

[23] Coastal Environments, Inc., *Cartographic Regression Analysis of Certain Tracts of Land Located in T. 11 S and T. 12 S., R. 15 E. (Southeastern Land District West of the Mississippi River), St. James Parish, Louisiana*, 66 (Feb. 19, 2020), available at: https://ccrjustice.org/sites/default/files/attach/2020/03/St.%20James%20Cemeteries%20%28Reduced%29%20%281%29.pdf.

130.    Since Formosa's knowledge of the Buena Vista Plantation Cemetery came to public light, Formosa has forced descendants to obtain a court order to get access to the site.

131.    Since Formosa's knowledge of the Buena Vista Plantation Cemetery came to public light, Formosa has initiated litigation against Inclusive Louisiana and others to purportedly resolve these questions, but then dismissed it, unliterally, without any resolution.

### iv. December 2019-May 2020 - Formosa denies access to the burial site for prayer, singing, and communing with ancestors.

132.    After confirming the existence and location of the Buena Vista Plantation Cemetery, Plaintiff Inclusive Louisiana's members visited the site to pray, sing, and commune with ancestors.

133.    Despite Louisiana law guaranteeing access to cemeteries, local sheriff's deputies arrived on occasion at the request of Formosa and threatened to arrest anyone who did not leave the property.

134.    The threat of arrest carries a significant risk because there is an underground pipeline running through the Buena Vista Plantation Cemetery, potentially subjecting it to Louisiana's critical infrastructure law, which punishes trespass on the premises of a pipeline with up to five years in prison.

135.    On May 1, 2020, Formosa, through its attorneys, sent a letter to the founding director of RISE St. James, a faith-based grassroots organization working toward environmental justice in the Parish, notifying her that access to the Formosa project site, including access to the Cemetery by descendants, was restricted.

### v. June 19, 2020 - Formosa is enjoined by a court from denying access to the burial site for prayer services on Juneteenth.

136.    RISE St. James, which included members of Inclusive, tried to reach out to Formosa through undersigned counsel for permission to conduct a one-hour prayer service on

21

Juneteenth 2020. They made several requests, but Formosa never responded.

137.    Given the threats of arrest, on June 15, 2020, RISE St. James filed in court for a temporary restraining order for access to the Cemetery to ensure that RISE and their partners were able to proceed with the planned prayer service without being arrested.

138.    On June 16, 2020, the court granted the temporary restraining order and ordered the company to allow the group to conduct the event on the site to avoid "immediate and irreparable injury [that would] occur to the[ir] constitutional and legal rights."[24]

139.    Formosa appealed the ruling the night before the event, but that writ application was denied by the appellate court.

140.    Formosa had at least one security guard present to surveil the ceremony.

141.    Several ministers and a Catholic priest, Father Vincent Dufresne, gathered with dozens of people in attendance to sing and pray at the Cemetery, inside the barbed wire fence.

142.    During the ceremony, Fr. Dufresne consecrated the gravesite.

### vi. October 31, 2020 - After Having Been Subject to the Previous Court Order, Formosa allows access for All Saints' Day ceremony, with surveillance.

143.    On October 31, 2020, RISE St. James also conducted an All Saints' Day celebration at the Buena Vista site, in which Inclusive's founding members participated as members of RISE, inside the chain-linked fence, at which Catholic Bishop Michael Duca conducted a prayer service.

144.    All Saints' Day is an important Christian ceremony during which cemetery and grave rituals take place.

145.    Formosa arranged for two security guards wearing yellow vests to be present

---

[24] Temporary Restraining Order, *RISE St. James, et al. v. FG LA, LLC* (June 19, 2020), available at: https://ccrjustice.org/sites/default/files/attach/2020/06/RISE%20TRO.pdf

at and to surveil the ceremony.

> ### vii. January 2025 - Formosa responded to Inclusive Louisiana's request for a Black History Month ceremony with delay, onerous access requirements, denial of advance access for planning, surveillance, and a lawsuit.

146. On December 20, 2024, through their counsel, Plaintiff Inclusive Louisiana contacted Defendant via email, through Attorneys Michael Drew and Marjorie McKeithen, requesting access to the Buena Vista Plantation Cemetery on February 23, 2025, with a response requested by January 15, 2024.

147. Inclusive requested access for that day from 1-3 p.m. for an "honoring and commemoration of people once enslaved there" because it was the last Sunday of Black History Month and they wished to "lay headstones there to honor five of the people they have confirmed were enslaved on the Buena Vista Plantation and who died while enslaved there."

148. On January 7, 2025, and again on January 22, Inclusive Louisiana, through their attorney, followed up via email.

149. On January 23, 2025, Formosa denied permission for Inclusive Louisiana to lay headstones or any markers on February 23.

150. Formosa also denied permission for Inclusive Louisiana to advertise the event with the descendant community.

151. Formosa also informed Inclusive Louisiana that attendees would have to sign up to attend in advance and sign a liability waiver in order to be allowed onto Formosa's property by its private security staff.

152. Formosa also informed Inclusive that it was requiring these steps because Inclusive members and attendees would "need to walk along unmaintained, unpaved roads and cross an open field" and because "an underground pipeline crosses the width of the Buena Vista burial site."

23

153.    Later that evening, Formosa's counsel notified Inclusive's counsel that Formosa had filed a lawsuit against Inclusive and two other organizations in federal court in the Eastern District of Louisiana.

154.    In its complaint, Formosa purported to seek a judgment "concerning the respective rights and obligations of FG and Defendants" with respect to the property and the Buena Vista Plantation Cemetery.

155.    In addition to questions concerning access and security measures, Formosa claimed that it sought "to confirm what is required and appropriate with respect to Defendants' stated intent to lay headstones or markers within the Buena Vista site that would name individuals[.]"

156.    Upon notice that Defendants were seeking relief in federal court, Inclusive's counsel notified Formosa's attorney that in light of then-pending litigation, Inclusive viewed the terms Formosa sought to impose, particularly questions of "public access to the cemetery, and the laying of permanent headstones at the gravesite" as questions for the court.

157.    Inclusive's counsel also advised Formosa's counsel that because there was not enough time to fully address these and other issues in court in advance of the date they wished to conduct the ceremony, Inclusive would agree to Formosa's terms for purposes of conducting that particular event, including not permanently laying headstones at the gravesite during the event, without conceding or waiving their rights under cemetery dedication law or other applicable laws.

158.    As set forth below in section (D)(ix), the resolution of these issues would not come to pass in that litigation because Formosa unilaterally dismissed the litigation two months after the event had passed, and without any other resolution of the outstanding questions.

24

159.    Before that, though, on February 11, 2025, Inclusive, through its counsel, requested advanced access to the burial site for planning purposes, to identify the best location for attendees to arrive and the route from LA-18 to the burial site.

160.    On February 21, 2025, Formosa refused Inclusive's request for advance access.

161.    On February 18, 2025, Formosa's counsel provided an onerous and overly broad waiver of liability that required further negotiation and impacted Inclusive's planning and outreach for the event.

### viii.    February 23, 2025 - Formosa prohibited Inclusive Louisiana from placing headstones at the burial site, failed to maintain a safe, reasonable pathway to the Cemetery, and surveilled and interrupted the sacred gathering for Black History Month.

162.    On February 23, 2025, Inclusive Louisiana held a prayer ceremony for Simon, Betsy, Rachel, Stanley, and Harry at the entrance to Formosa's property.

163.    The Descendants Project attended and participated in the prayer ceremony.

164.    The ceremony was held at the entrance, and not at the Buena Vista Plantation Cemetery as agreed, because Formosa refused to allow vehicles to access the pathway to the site.

165.    When visitors arrived, it was pouring heavy rain.

166.    Formosa's contracted security firm, Rollo Security Services, walked up to arriving vehicles to check IDs against the attendance list and have visitors sign the waiver. They also went onto the bus that Inclusive arranged to transport visitors to the event.

167.    Inclusive had made the decision to have a bus due to delays in getting an address from Formosa to provide to attendees.

168.    Formosa's hired security informed the people on the bus that no vehicles would be permitted to drive down the pathway and that the only access that would be permitted was walking by foot to the site.

25

169.    The security guards described the walk as "more than three-quarters of a mile."

170.    Inclusive, through its counsel present at the event, spoke to the security guards multiple times about vehicle transportation to the burial grounds.

171.    Counsel requested that vehicles be allowed to go to the burial grounds, or that only the bus be allowed to drive to the burial grounds, or that only the elderly people in attendance be allowed to use a vehicle.

172.    All of these requests for transport were denied.

173.    Rollo Security also had two supervisors in two black trucks, one of which drove up and down the path during these discussions, worsening the walking conditions on the unpaved and unmaintained pathway.

174.    Inclusive decided to hold the prayer ceremony at the entrance to Formosa's property, and not at the Buena Vista Plantation Cemetery, under a makeshift tent, so that all attendees could be present.

175.    During the prayer ceremony, one of Formosa's security guards drove their truck up close to the tent that Inclusive, The Descendants Project, and the other attendees stood under to avoid standing in the pouring rain.

176.    Another security guard walked around and through the ceremony yelling and instructing attendees to be sure to sign the attendance list and asking whether they had signed in, in the middle of prayer, singing, and other ceremonial activities.

177.    When asked to be quiet or to leave the tent by multiple people, he remained and remarked that he would not step out from under the tent and continued to repeat himself.

178.    After the prayer ceremony, moved by the rare opportunity to honor the lives of the formerly enslaved at the site of their final resting place, many, but not all, attendees, including the founders of Inclusive Louisiana and The Descendants Project, made the cold and

26

rainy near-mile walk each way to the burial grounds to lay flowers that had been brought, one each for Simon, Betsy, Rachel, Stanley, and Harry.

### ix. April 2025 - Formosa Dismisses Its Lawsuit Without the Resolution of the Issues It Claimed to Seek.

179. On April 21, 2025, nearly three months after Inclusive had agreed to leave questions about terms of access and laying of headstones subject to any ruling by the court in the lawsuit Formosa filed against them, Formosa filed a Notice of Voluntary Dismissal of their Complaint.

180. Between the filing and dismissal of its lawsuit, Formosa had never formally served Inclusive with the complaint, nor sought a waiver of service pursuant to Fed. R. Civ. Proc. 4(d).

181. On April 24, 2025, the U.S. District Court for the Eastern District of Louisiana dismissed Defendants' Complaint.

182. Thus, during negotiation about access to the site, Formosa brought a lawsuit purporting to seek a declaratory judgment clarifying the rights and liabilities of the parties about access to that site, which it never served or pursued.

183. The filing of this lawsuit impacted Inclusive in the pursuit of its rights to worship at the site and commemorate and honor the dead in one of the most common ways – laying of headstones.

184. Formosa's start-and-stop litigation served to delay and harass Inclusive in their efforts to honor those buried at Buena Vista, and incur the additional time and expense of commencing the instant litigation to get a resolution of the matter.

### E. Plaintiffs Wish to Remove the Mark of Slavery, Properly Honor the Deceased, and Preserve and Foster Their Cultural Origins

185. Plaintiffs wish to have regular, safe, and meaningful access to the Buena Vista

Plantation Cemetery, to pray at it and to care for and maintain it, including by laying headstones for Simon, Betsy, Rachel, Stanley, and Harry: to properly honor their lives, mark the site where they lived and died, and to bring dignity in death that was denied to them in life.

186.    As Formosa's own archaeologist has acknowledged, the lack of headstones marking the burials of enslaved people and records of their deaths was a clear indicator that the Cemetery was likely the burial ground of enslaved people.

187.    The lack of record, and regard, for their final resting place was another function of the slavery system that furthered the dehumanization and indignity of the people enslaved, even in death, and for generations of their descendants.

188.    The laying of headstones is a particularly sacred activity for African American communities in Louisiana and across the South, reflecting the history of how the institution of slavery prohibited proper burials and how generations of African Americans in the South were violently prohibited from performing funerals and burial rites for their deceased.

189.    The gravestones that have been prepared for the Buena Vista Plantation Cemetery also seek to redress the harm faced by the descendants of those enslaved of being unable to fully preserve their cultural origins.

190.    These descendants face unique and steep challenges when attempting to conduct genealogical research because record keeping about the lives of enslaved persons focused on financial or other benefits to the enslaver, and not on preserving knowledge about enslaved persons themselves.

191.    The buying, selling, and forcible relocation of countless enslaved people and forcible separation of families make retracing these transactions all the more difficult, sometimes impossible.

28

192. This multi-generational injury visited upon their descendants has led to specific cultural practices of kinship, wherein people consider themselves descendants of ancestors tied together in bondage, like being enslaved on the same land.

193. Because they were often not marked, and could not be tended to by descendants, known burial sites are rare, and when they are somehow found, they take on a whole new level of religious, cultural, and historical significance.

194. That there are any known cemeteries to protect is itself extraordinary given the denial, minimizing, destruction, and attempted erasure of that history endured by the descendants of people enslaved in St. James Parish.

195. The historical significance of these cemeteries, therefore, carries even deeper significance as the final resting place of a people whom those more powerful intended to disappear from history.

196. Preservation, promotion, and fostering of these remnants of their cultural origins–through access to and care, maintenance, and protection of the burial grounds–is critical when such sites are discovered.

197. Like all discovered cemeteries of the enslaved, the Buena Vista Plantation Cemetery is sacred ground, a precious and irreplaceable connection through time when there was once little hope of finding the gravesites because their ancestors' lives were so devalued that their burials did not merit formal recording by plantation owners or the dominant society around them.

29

## CLAIMS FOR RELIEF

## CLAIM I: THIRTEENTH AMENDMENT

**Formosa's Ownership and Control of the Bodies of Those Enslaved During Slavery and its Policing, Surveillance and Control of Descendants Violates the Thirteenth Amendment of the U.S. Constitution as a Present-Day Relic, Badge or Incident of the Slavery System.**

198. Plaintiffs re-allege and incorporate by reference here paragraphs 1-197 of this Complaint.

199. Ratified in 1865, the Thirteenth Amendment abolished slavery, including the "lingering vestiges," badges and incidents of the slavery system and constitutionalized universal freedom. Jacobus tenBroek, *Thirteenth Amendment to the Constitution of the United States: Consummation to Abolition and Key to the Fourteenth Amendment*, 39 Cal. L. Rev. 171, 174 (1951), https://lawcat.berkeley.edu/record/1109320?v=pdf (quoting Cong. Globe, 38th Cong., 1st Sess. 1199, 1319, 1321, 1324 (1864) (statements of Sen. Wilson of Massachusetts) (1864)).

200. United States courts and an international treaty abolishing slavery have emphasized that the defining feature of chattel slavery is the ownership of a person as property. *Plessy v. Ferguson*, 163 U.S. 537, 542 (1896) (observing that slavery implies "the ownership of mankind as a chattel" and "the absence of a legal right to the disposal of his own person, property, and services"), *overruled by*, *Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1954); *see also* U.N. Slavery Convention, art. 1 (1926) *available at* https://www.ohchr.org/en/instruments-mechanisms/instruments/slavery-convention (defining slavery as the "status or condition of a person over whom any or all of the powers attaching to the right of ownership are exercised").

201. When the Thirteenth Amendment was ratified it dissolved the legal bonds of that ownership throughout the United States.

30

202. Prior to Emancipation, the Winchester family exercised a brutal form of ownership over those buried at Buena Vista, mortgaging at least some of them while they were alive, and then continuing to do so even after their deaths, using their bodies as collateral for loans or financial interest in banking endeavors.

203. Their bodies continued to be the subjects of financial transactions and profit-driven decision making through the intervening years as ownership of the property in which they were buried–and thereby ownership of their bodies–changed hands from one owner to the next, without concern or regard for their gravesites as sacred places of rest.

204. Formosa is now the owner of these graves, of those buried in them, and an inheritor of that legacy and "lingering vestige" of slavery.

205. When Formosa confirmed the existence of the graves, it did not notify the local government or broader community of concerned residents, including Plaintiffs, and undertook planning to remove the graves.

206. Formosa has at times denied descendants of people enslaved in St. James Parish, including Plaintiff Inclusive's members, access to the site to honor and commemorate those buried there.

207. Formosa has also denied Inclusive Louisiana permission to lay headstones at the gravesite to honor those buried there.

208. Formosa has made it very burdensome for Inclusive Louisiana to get access to the Cemetery, including expecting weekslong advance notice, changing its conditions for event approval, not paving or maintaining the pathway that leads to the Cemetery, and requiring attendees to walk the approximately 1.5 miles, from the highway to the Cemetery and back to the highway, in the pouring rain.

209. Inclusive Louisiana and The Descendants Project, or any other person in the

descendant community, cannot access or otherwise care for and commune with those who are buried in the Buena Vista Plantation Cemetery unless Formosa says so and on a one-time basis.

210. Formosa's conduct violates the constitutional rights of Inclusive and The Descendants Project under the Thirteenth Amendment of the United States Constitution and said rights will continue to be irreparably injured without court intervention.

## CLAIM II: LOUISIANA CEMETERY DEDICATION LAW

211. Plaintiffs re-allege and incorporate by reference here paragraphs 1-197 of this Complaint.

212. Louisiana cemetery law protects the rights of descendants to access, maintain, care for, and protect the burial grounds of their ancestors, and it prohibits desecration, destruction, and profanation of the Cemetery.

213. Louisiana law protects burial grounds as hallowed ground. Given the sacred nature of burial grounds, "[r]egardless of the laws and rules relating to the ownership and control of real property, when a plot of ground is set apart for cemetery purposes, and burials are made in the land, the ground changes its character in the minds and feelings of the community. It assumes a sacred quality…" *Humphreys v. Bennett Oil Corp.*, 195 La. 531, 551 (1940) (citations omitted).

214. Louisiana law is clear that these protections extend to all burial grounds. When cemeteries or burial grounds are discovered on private property, the landowner may not categorically and unreasonably prevent access to those sites. *See In re St. James Methodist Church of Hahnville*, 95-410, pp. 6, 8 (La. App. 5 Cir. 12/27/95), 666 So. 2d 1206, 1209-10 (citing *Vidrine v. Vidrine*, 225 So.2d 691, 697-698 (La. App. 3rd Cir. 1969)).

215. Louisiana cemetery law requires that "[r]elatives and friends of persons buried

in . . . [a] cemetery have unrestricted rights to visit and care for the graves" of their ancestors and loved ones. *See id.*; *see also Ass'n of Cemetery Tour Guides & Cos. L3C v. New Orleans Archdiocesan Cemeteries*, 2024-0044 (La. App. 4 Cir. 9/4/24), 401 So. 3d 797, 805 ("[T]hose bonded to those persons by blood and/or the mutual affinity of friendship have a recognized right to visit and care for the graves of the deceased."), *writ denied*, 2024-01272 (La. 12/27/24), 397 So. 3d 1223.

216.    The Buena Vista Plantation Cemetery, which is on Formosa's property, is a dedicated cemetery for those enslaved on the Buena Vista Plantation. *See Thomas v. Mobley*, 118 So. 2d 476, 478 (La. App. 1 Cir. 1960) (finding that a cemetery of enslaved people was a dedicated cemetery by virtue of being set apart and used for cemetery purposes (citations omitted)).

217.    Formosa has known of the existence of the Buena Vista Plantation Cemetery on its property, and therefore had notice of its obligations under Louisiana law, at least since it was informed of the Cemetery's existence and location by the Louisiana Division of Archeology in July 2018.

218.    Given how slavery operated, how families were routinely separated, and how difficult it is to trace direct ancestry, Plaintiffs, along with members of the descendant community of the River Parishes, are entitled to enjoy "unrestricted rights" to "visit and care" for the Cemetery. *In re St. James Methodist Church of Hahnville*, 95-410, pp. 6, 8, 666 So. 2d at 1209-10 (citing *Vidrine*, 225 So.2d at 697-698).

219.    Formosa has violated these rights under Louisiana law in numerous ways, including:

■    preventing Plaintiff Inclusive's members, The Descendants Project, and others from accessing the Cemetery, necessitating legal action;

- placing onerous, changing conditions on Plaintiffs' and local descendant community's access to the Cemetery, through extended negotiations;

- failing to have a straightforward process by which descendant communities may access the Cemetery without legal negotiation or burdensome barriers to entry,

- interfering with descendants' attempts to care for, maintain and worship at the Cemetery; and

- surveilling Plaintiffs while they access the Cemetery; and

- failing to maintain a safe pathway for to and from the Cemetery.

220.    As a direct and proximate result of Formosa's conduct, Inclusive and The Descendants Project will suffer irreparable harm without court intervention.

## RELIEF REQUESTED

WHEREFORE, Inclusive Louisiana and the Descendants Project respectfully request that this Court grant the following relief:

a. Issue injunctive relief preventing the removal or otherwise desecration of any human remains found on Formosa's property in the Buena Vista Plantation Cemetery and other found burial grounds on the property;

b. Issue an order that ends Formosa's control over the Cemetery and the individuals buried therein;

c. Declare that Inclusive Louisiana and The Descendants Project have rights under the Thirteenth Amendment of the U.S. Constitution and Louisiana cemetery law that Formosa has violated their rights related to their unrestricted access to and care for the Buena Vista Plantation Cemetery;

34

d. Issue injunctive relief ordering that descendant communities, including Plaintiffs, have unrestricted access to and the ability to care for, maintain, and protect the Cemetery and other found burial grounds on the Formosa site;

e. Issue injunctive relief preventing interference with the placing of headstones inside the Cemetery by Plaintiffs;

f. Issue injunctive relief ordering further investigations, in consultation with experts retained by Plaintiffs, to determine the existence and location of other burial grounds on Formosa's property in St. James Parish; and

g. Any other relief the Court deems just and proper in law and equity.

Dated: July 9, 2025

Respectfully Submitted,

s/ Pamela C. Spees
Pamela C. Spees, Trial Attorney
La. Bar Roll No. 29679
Kayla Vinson*
Emily Early*
Korbin Felder*
Astha Sharma Pokharel*
Celine Zhu*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel. & Fax (212) 614-6462
pspees@ccrjustice.org
kvinson@ccrjustice.org
eearly@ccrjustice.org
kfelder@ccrjustice.org
asharmapokharel@ccrjustice.org
czhu@ccrjustice.org

*Application for pro hac vice admission forthcoming