UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| INCLUSIVE LOUISIANA ET AL. | CIVIL ACTION |
| VERSUS | NO. 25-1398 |
| FG LA LLC | SECTION: "J"(3) |

## ORDER AND REASONS

Before the Court is a *Motion to Dismiss* **(Rec. Doc. 9)**, filed by Defendant FG LA LLC ("FG"). Plaintiffs Inclusive Louisiana and The Descendants Project opposed the motion (Rec. Doc. 20), and FG filed a reply memorandum (Rec. Doc. 24). Having considered the motion and legal memoranda, the record, the parties' oral arguments, and the applicable law, the Court finds that the motion to dismiss should be **GRANTED**.

## FACTS AND PROCEDURAL BACKGROUND

The immediate events that gave rise to this litigation began in roughly 2018. However, the underlying issues involved date back to the time of slavery. Beginning in the 18th century, Louisiana was home to sugarcane plantations along the Mississippi River between New Orleans and Baton Rouge. The sugarcane plantation owners accumulated great wealth by using the labor of enslaved people, many of whom died because of this oppressive and high-risk work. In fact, "[s]ugarcane cultivation was brutal, even by the standards of American slavery." John Bardes,

*Plantation Slavery in Antebellum Louisiana*, 64 Parishes (Mar. 3, 2026), https://64parishes.org/entry/plantation-slavery-in-antebellum-louisiana.

The working conditions on these plantations were so harsh that death rates surpassed birth rates in the sugar parishes. *Id.* When enslaved people died, their enslavers usually had them buried on unprofitable land, which meant "uncultivated land in the back of the plantation, further away from the Mississippi River and in or at the edge of the forest." (Rec. Doc. 1, at 11). Generally, the graves of enslaved people were not marked by headstones; instead, they might be marked by a tree or a wooden cross if they were marked at all.

The proximity to the Mississippi River that attracted the sugar barons before the Civil War also drew petrochemical plants to the area in the 20th century. Inevitably, many of these industrial sites contain unmarked cemeteries of enslaved people. Defendant, FG LA LLC (also known as Formosa Plastics), purchased a large tract of land in St. James Parish, which is located on the sites of two former plantations, the Acadia and Buena Vista Plantations. Plaintiffs, Inclusive Louisiana and The Descendants Project, brought this action for declaratory and injunctive relief concerning the organizations' members' rights to access the Buena Vista Plantation Cemetery, an unmarked cemetery which was rediscovered after FG purchased the land. Specifically, Plaintiffs' members "wish to honor the deceased enslaved persons who are buried at the Buena Vista site," persons "whose burials were not afforded the recordation, memorial, protection, reverence, and care to which their enslavers and

other free persons have always been entitled, and whose bodies were, and continue to be, owned in death as part of the land." (Rec. Doc. 1, at ¶¶ 16, 19).

Both Plaintiffs in this matter, Inclusive Louisiana and The Descendants Project, are community advocacy organizations founded by descendants of formerly enslaved people in Louisiana's River Parishes. Inclusive Louisiana is based in St. James Parish and has a mission "to spread enlightenment and hope to create a fairer and more inclusive society," along with its vision to "educate and inform the community about social, racial, and environmental justice . . . ." *Id.* at ¶ 24 (internal quotation marks omitted). The Descendants Project was founded in Wallace, Louisiana with the goal "to preserve, foster, and promote the cultural origins of descendants of the enslaved in the River Parishes; and champion the voice of the Black descendant community while demanding action that supports the total health and well-being of Black descendants in the River Parishes." *Id.* at ¶ 28.

Defendant FG is a member of Formosa Plastics Group, a conglomerate based in Taiwan. In 2017, the company chose St. James Parish as the site for The Sunshine Project, a proposed $9.4 billion complex that will house fourteen petrochemical and plastics manufacturing units within a consolidated facility. *Frequent Questions*, FG Sunshine Project, https://www.sunshineprojectla.com/faq.php (last visited Apr. 21, 2026); Delaney Dryfoos, *Formosa Plastics Returns to Fight Again*, The Lens (Aug. 19, 2024), https://thelensnola.org/2024/08/19/formosa-plastics-returns-to-fight-again/. This complex is set to be "one of the largest plastics plants in the world." Alexandra Yetter, *Formosa Plastics Halts Some Work on $9.4 Billion Louisiana Plant*,

Bloomberg L. (July 24, 2020), https://news.bloomberglaw.com/environment-and-energy/formosa-plastics-halts-some-work-on-9-4-billion-louisiana-plant. To this end, FG purchased a 2,375-acre tract of land in St. James Parish's District 5 (Rec. Doc. 1, at ¶ 88). Relevant to this lawsuit, this land spans parts of the former Buena Vista and Acadia Plantations, including the graves and cemeteries of the enslaved people who died and were buried on these plantations. *See id.* at ¶¶ 93, 108.

Plaintiffs claim that Defendant became aware of these unmarked graves as early as August of 2018, after it had purchased the land. Defendant hired archaeologists who "confirmed the existence of the Buena Vista Plantation Cemetery," specifically five grave shafts, on the property and further concluded that past development had likely destroyed the Acadia Plantation Cemetery. *Id.* at ¶¶ 112, 118. Rather than removing the remains, Defendant opted to fence off the area, and according to Plaintiffs, "Formosa has not undertaken any other activity to preserve the Cemetery" since that time. *Id.* at ¶¶ 114, 117. Further, Defendant explained at oral argument that the Buena Vista Cemetery site does not fall within the "construction footprint" for the petrochemical and plastics manufacturing complex.

Plaintiffs' members, descendants of enslaved people in the River Parishes, had long believed that their ancestors were buried at this site. More than a year after Defendant confirmed the existence of an unmarked gravesite, and after its land use application had been approved, some of Inclusive Louisiana's members, along with others in the community, learned about the cemetery through public records requests to Louisiana's Division of Archaeology. At this point, community members began to

visit these unmarked gravesites "for prayer and memorial," but Plaintiffs allege that Defendant threatened to have them arrested. *Id.* at ¶ 12.

During this time, Plaintiff Inclusive Louisiana worked with another community advocacy organization, Louisiana Bucket Brigade, to research and identify some of the formerly enslaved people buried in the Buena Vista Cemetery. A genealogy expert, Lenora Gobert, determined the identities of five of the people buried at the site primarily by relying on mortgage records, because "their bodies were mortgaged in financial transactions by Benjamin Winchester [a past owner of Buena Vista Plantation] to secure wealth for himself." *Id.* at ¶ 54. Subsequently, Inclusive Louisiana and Louisiana Bucket Brigade published a report about these five people who died while enslaved on the Buena Vista Plantation—Simon, Betsy, Rachel, Stanley, and Harry—and ultimately had headstones created for them. However, Plaintiffs contend that Defendant has refused to allow them to place these headstones on the graves.

Toward the end of 2024, Plaintiffs allege that their counsel sought access to the Buena Vista Cemetery for a Black History Month ceremony planned for February of 2025. Further, Plaintiffs' counsel informed FG's counsel of Plaintiffs' intent to lay the headstones for Simon, Betsy, Rachel, Stanley, and Harry during this event. According to Plaintiffs, counsel for Defendant, at different times during these negotiations, denied Plaintiffs' requests to lay headstones and to advertise the event and set out various restrictions, including that "attendees would 'need to walk along unmaintained, unpaved roads and cross an open field'" due to an underground

pipeline on the property.[1] *Id.* at ¶ 152. Further, Plaintiffs assert that Defendant required the attendees to register in advance and to sign a liability waiver. *Id.* at ¶ 151.

On the same evening that these negotiations were ongoing, Defendant notified Plaintiff Inclusive Louisiana that it had filed a lawsuit in the Eastern District of Louisiana in which it sought a declaratory judgment "concerning the respective rights and obligations of FG and Defendants" vis-à-vis the cemetery. *FG LA LLC v. Inclusive La. et al.*, No. 25-170, Rec. Doc. 1, at 1 (Jan. 24, 2025). Plaintiffs contend that they decided to comply with FG's restrictions for the Black History Month ceremony because they anticipated that they would be able to resolve issues of access in the lawsuit. However, FG never served Plaintiffs with the complaint in that matter and voluntarily dismissed the case on April 24, 2025. At the Black History Month ceremony, Plaintiffs allege that they faced onerous restrictions and intrusive surveillance by Rollo Security Services, a firm hired by Defendant presumably for the event.

After Defendant voluntarily dismissed its declaratory action against Plaintiff Inclusive Louisiana in April of 2025, Plaintiffs instituted the instant action to resolve the issues of access they had hoped to clarify in that suit. Plaintiffs bring claims for declaratory and injunctive relief under the Thirteenth Amendment and Louisiana cemetery dedication law, and among other requested relief, they seek an injunction

---

[1] The Court can only assume that Defendant was concerned about the pipeline servitude holder's rights and Louisiana's critical infrastructure law, which imposes severe penalties on a person who criminally damages critical infrastructure, such as a pipeline. La. Stat. Ann. § 14:61.1.

"ordering that descendant communities, including Plaintiffs, have unrestricted access to and the ability to care for, maintain, and protect the Cemetery and other found burial grounds on the Formosa site." (Rec. Doc. 1, at 37). In the instant motion, Defendant moves to dismiss Plaintiffs' claims pursuant to Rules 12(b)(1), 12(b)(6), and 12(b)(7) of the Federal Rules of Civil Procedure.

## LEGAL STANDARD

### A. Rule 12(b)(1)

The Court must consider Defendant's challenge to subject matter jurisdiction under Rule 12(b)(1) before deciding the other Rule 12 motions to dismiss because jurisdiction is a threshold determination. *See In re Great Lakes Dredge & Dock Co., LLC*, 624 F.3d 201, 209 (5th Cir. 2010). When deciding a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), "the district court is 'free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case.'" *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005). The party asserting jurisdiction must carry the burden of proof to defeat a Rule 12(b)(1) motion to dismiss. *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011) (citation omitted). The standard of review for a Rule 12(b)(1) motion to dismiss is the same as that for a motion to dismiss pursuant to Rule 12(b)(6).

### B. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[D]etailed factual allegations" are not required, but the pleading must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. The court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (citation omitted).

## DISCUSSION

### I. Motion to Dismiss for Lack of Subject Matter Jurisdiction Under 12(b)(1)

Here, Defendant claims that the Court lacks subject matter jurisdiction on two justiciability grounds. First, Defendant contends that Plaintiffs lack standing because they have not sufficiently alleged an injury in fact that is concrete, particularized, and redressable. Next, according to Defendant, Plaintiffs' claims are unripe, "resting on hypothetical future events rather than any existing controversy." (Rec. Doc. 9-2, at 2). The Court will address Article III standing first and then proceed to analyze ripeness.

The standing inquiry identifies "disputes which are appropriately resolved through the judicial process," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted), and when "a plaintiff lacks Article III standing, then a federal court lacks jurisdiction to hear the complaint." *Delta Com. Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council*, 364 F.3d 269, 272 (5th Cir. 2004) (citation omitted). To have standing, a plaintiff must allege (and ultimately prove) (1) an injury in fact, which is "a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical," (2) causation, which is "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant," and (3) redressability, which is "a likelihood that the requested relief will redress the alleged injury." *Servicios Azucareros de Venezuela, C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 799–800 (5th Cir. 2012) (internal quotation marks omitted).

"A plaintiff must demonstrate standing with the manner and degree of evidence required at the successive stages of the litigation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Lujan*, 504 U.S. at 561) (internal quotation marks omitted). Thus, "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim." *Tex. Cable & Telecomms. Ass'n v. Hudson*, 265 F. App'x 210, 216 (5th Cir. 2008) (quoting *Lujan*, 504 U.S. at 561) (internal quotation marks omitted); *see also Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 264–65 (1991) (noting that on a motion to dismiss

for want of standing, courts must accept as true all material allegations contained in the complaint).

Associations, such as Plaintiffs in this case, can assert two theories of standing: organizational and representational (which is frequently referred to as "associational"). Organizational standing, on the one hand, allows an association to "base standing on an injury to that organization itself—such as incurring a non-litigation expense or curtailing its activities as a result of the challenged action." *Hat v. Landry*, No. 20-CV-00983, 2021 WL 1823089, at *8 (W.D. La. May 5, 2021) (citing *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017)). For organizational standing, an association must satisfy the same standing requirements that apply to an individual: (1) injury, (2) causation, and (3) redressability. *Id.*

Representational standing, on the other hand, allows an association to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

In this case, two associations, Inclusive Louisiana and The Descendants Project, seek declaratory and injunctive relief on claims that Defendant FG (1) has violated the Thirteenth Amendment by denying and/or hindering access to the Buena Vista Plantation gravesite, thereby perpetuating the badges and incidents of

slavery, and (2) has run afoul of Louisiana law, custom, and *jurisprudence constante* related to dedicated cemeteries. Plaintiffs allege that they have both organizational and representational standing to bring these claims. The Court will begin by discussing organizational standing.

To establish organizational standing, Plaintiffs must first demonstrate an injury in fact. Relying on the Fifth Circuit's decision in *Texas State LULAC v. Elfant*, Defendant argues that Plaintiffs lack organizational standing because they have not had to "divert[] significant resources to counteract the defendant's conduct" such that the Organizations' "ability to pursue [their] mission" has been impaired. (Rec. Doc. 9-2, at 8 (quoting *Tex. State LULAC v. Elfant*, 52 F.4th 248, 253 (5th Cir. 2022))). Conversely, Plaintiffs contend that diversion of resources is not the only way for an organization to demonstrate injury in fact for the purpose of organizational standing. They cite *Texas Tribune v. Caldwell County, Texas* to support their claim that "[w]hen an organization's mission relies on physical access, denial of access confers standing." (Rec. Doc. 20, at 8 (citing *Tex. Tribune v. Caldwell Cnty., Tex.*, 121 F.4th 520, 526–27 (5th Cir. 2024))).

In the case Defendant cites, *Texas State LULAC v. Elfant*, two voter registration organizations sued county election officials to enjoin the enforcement of Texas Senate Bill 1111, which made changes to the Texas Election Code's residency provisions. *Tex. State LULAC*, 52 F.4th at 251–52. In deciding cross-motions for summary judgment, the district court found that the plaintiff-organizations had established organizational standing on two grounds: (1) S.B. 1111 chilled the

organizations' speech, and (2) the organizations had diverted resources "to counteract the law's effects on their voter registration activities." *Id.* at 252. In other words, the district court concluded, in part, that S.B. 1111 impaired the organizations' missions based on their diversion of resources, but in addition, the court recognized that a constitutional rights violation also represented a cognizable injury on which organizational standing could be based. The United States Court of Appeals for the Fifth Circuit reversed the district court's decision without reaching the merits of the case because the Fifth Circuit held that the organizations lacked Article III standing. However, the court did not base this holding on a lack of injury in fact, but instead, the Court found that the plaintiff-organizations had failed to demonstrate traceability and redressability. *Id.* at 254–55.

In the instant case, Plaintiffs do not base their argument for organizational standing on a diversion of resources theory. Instead, Plaintiffs claim that Defendant's conduct has "frustrated or otherwise impeded" their ability to carry out their organizational missions, and that this impairment of the Organizations' missions constitutes an injury in fact. (Rec. Doc. 20, at 7). To support this claim, Plaintiffs rely on *Texas Tribune v. Caldwell County, Texas*, a case that involved two non-profit news organizations and an advocacy organization that sought to enjoin the enforcement of a county policy which "categorically exclude[ed] the press and the public from observing criminal pretrial proceedings commonly referred to as magistrations." *Tex. Trib.*, 121 F.4th at 524. The three plaintiff-organizations' missions overlapped in that the news organizations reported on local criminal justice issues, including bail and

pretrial detention, and the advocacy group, Mano Amiga, "relie[d] on access to magistrations" so that they could bail people out of jail, "advocate for arrestees and victims of crime," and provide support and education for the local community. *Id.* at 527.

All three organizations alleged that the policy prohibiting them from attending magistrations substantially impeded their missions and violated their First Amendment right of access. *Id.* at 526–27. The primary issue the court considered when evaluating standing was whether the organizations had established a cognizable injury in fact. The Fifth Circuit affirmed the district court's ruling that the organizations had organizational standing to challenge the policy not based on a diversion of resources theory of injury, but instead because the denial of access itself constituted an injury in fact by impairing the organizations' missions. *Id.* at 527.

In this case, Plaintiffs argue that they cannot fulfill their organizational missions without access to the Buena Vista Cemetery where formerly enslaved persons are buried. Inclusive Louisiana is a faith-based "grassroots community advocate organization" whose mission is "to spread enlightenment and hope to all people to create a fairer and more inclusive society." *About Us*, Inclusive Louisiana, https://inclusivelouisiana.org/about/ (last visited Mar. 30, 2026). Further, Inclusive Louisiana's vision includes educating the community about "social, racial, and environmental justice." *Id.* The property Defendant owns is located in a majority-black district of St. James Parish, and many of these black residents are likely descendants of enslaved people. Having access to the unmarked cemeteries of

enslaved people who died on plantations, and being able to recognize, honor, and respect these final resting places, would inevitably help advance Inclusive Louisiana's mission of spreading hope, creating a fairer and more inclusive society, and educating the community about social, racial, and environmental justice.

Similarly, The Descendants Project "aim[s] to champion the voice of the Black descendant community while demanding action that supports their total well-being." *About*, The Descendants Project, https://www.thedescendantsproject.org/about (last visited Mar. 30, 2026). The ability of descendants of enslaved people to acknowledge their history and to save their ancestors from erasure would inevitably support their total well-being, and The Descendants Project cannot truly champion the voice of the Black descendant community without having access to the sacred sites where their ancestors are buried. In opposition to Defendant's argument concerning injury, Plaintiffs allege that they have suffered an injury in fact because FG has impaired their missions, namely by restricting their access to the Buena Vista Cemetery and thereby preventing them from visiting the graves of their ancestors, maintaining the cemetery, placing gravestones, and otherwise honoring the formerly enslaved individuals who are buried there.

Here, the injury in fact that Plaintiffs allege meets all requirements for standing purposes. First, the injury in fact must consist of "an invasion of a legally protected interest." *Lujan*, 504 U.S. at 560 (citations omitted). Louisiana courts have long affirmed the ancient principle, also recognized at common law and dating back at least to Justinian, that "[r]egardless of the laws and rules relating to the ownership

and control of real property, when a plot of ground is set apart for cemetery purposes, and burials are made in the land, the ground changes its character in the minds and feelings of the community." *Humphreys v. Bennett Oil Corp.*, 197 So. 222, 229 (La. 1940). Moreover, Louisiana courts have also required "mandatory access for members of the public to isolated cemeteries."[2] Ryan M. Seidemann, *The Sanctity of the Dead: Cemetery Protection Laws Are Not Takings of Private Property*, 46 S.U. L. Rev. 53, 75 (2018) (citing *In re St. James Methodist Church of Hahnville*, 95-410 (La. App. 5 Cir. 12/27/95), 666 So. 2d 1206, 1209; *Vidrine v. Vidrine*, 225 So. 2d 691, 697–98 (La. Ct. App. 1969); *Roberts v. Stevens*, 389 So. 2d 782, 785 (La. Ct. App. 1980); and cases from other states). Therefore, Plaintiffs have sufficiently alleged that Defendant's denial and hindrance of access to the Buena Vista Cemetery have caused an invasion of one of Plaintiffs' legally protected interests.

Second, the injuries that Plaintiffs allege are concrete and particularized. For example, on some occasions when members of Inclusive Louisiana have visited the gravesite to "pray, sing, and commune with ancestors," Plaintiffs claim that Defendant has called sheriff's deputies to the property who have threatened Inclusive Louisiana's members with arrest. (Rec. Doc. 1, at ¶¶ 132–35).

Plaintiffs have also provided examples of access restrictions and what they call Defendant's "interfering conduct" during the gathering on February 23, 2025, namely Defendant's denial of vehicle access to the cemetery and the employment of a private

---

[2] An "isolated cemetery" is one that has "become separated from easy access due to property transfers and the like, typically causing [it] to lie wholly within the property of someone unrelated to the descendants of those interred in the cemetery." Seidemann, *supra*, at 75 n.101.

security firm to "surveil, interfere, and harass Plaintiffs during the ceremony." (Rec. Doc. 20, at 9). In sum, Plaintiffs maintain that "Defendant's threats of arrest and policy of piecemeal litigious access to Buena Vista Cemetery, including litigation initiated by Defendant . . . as well as its surveillance and interference of Plaintiffs' activities in the instances where access is granted . . . are all discrete, redressable injuries caused by Defendant's conduct." *Id.* The Court agrees. Lastly, the Court finds that the injury Plaintiffs have pleaded is both actual *and* imminent in that it is ongoing.

Having determined that Plaintiffs sufficiently pleaded injury in fact, the Court turns to standing's other two requirements: traceability and redressability. Here, the frustration of Plaintiffs' organizational missions, which consists in FG's denial and/or hindrance of access to the Buena Vista Cemetery, is traceable directly to Defendant, which owns the land on which the cemetery is located. Finally, the Court finds that the injury is redressable. Plaintiffs seek declaratory and injunctive relief concerning their legal rights vis-à-vis the cemetery, which is in the Court's power to grant, and this type of relief would redress the harm that Plaintiffs allege they have suffered.

Next, Defendant asserts that Plaintiffs cannot establish associational, or representational, standing either. As explained above, for associational standing, Plaintiffs would have to prove that (1) at least one of Plaintiffs' members has standing in their own right, (2) "the interests [each organization] seeks to protect are germane to the organization's purpose"; and (3) that the lawsuit would not require the individual member's participation. *Ass'n of Am. Physicians & Surgeons, Inc.*, 627 F.3d

at 550. Defendant argues primarily that Plaintiffs have not alleged that any of their individual members have suffered an injury in fact, and that even if an individual member did have standing, that member would have to participate in the proceeding to prove a direct family lineage to one or more of the people buried at the Buena Vista site. The Court disagrees.

First, as explained above in the Court's discussion of organizational standing, not only have Plaintiffs *qua* organizations suffered an injury in fact, but also Plaintiffs' individual members who have visited the Buena Vista site and experienced onerous restrictions meant to impede their access have suffered an injury in fact. Also as discussed above, the interests that the organizations seek to protect are directly related, and therefore germane, to their organizational purposes.

As its last justiciability argument for dismissal, Defendant urges that the relief Plaintiffs seek is not ripe for judicial review. Article III of the Constitution restricts a federal court's jurisdiction to actual "cases" or "controversies." U.S. Const. art. III, § 2, cl. 1. Whether this requirement is met when a plaintiff requests relief pursuant to the federal Declaratory Judgment Act depends upon "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–42 (1937)).

The controversy at the heart of a declaratory judgment must also be ripe, and the Supreme Court stated the general rule for determining ripeness in *Aetna Life Insurance Co. v. Haworth* when it explained that the controversy "must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna*, 300 U.S. at 241 (citations omitted). In general, a claim is "ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required." *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1153 (5th Cir. 1993). To determine ripeness, a court must consider and balance "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987) (citations omitted).

Here, Defendant first argues that Plaintiffs have not identified an existing injury that is concrete, but that instead, their "Complaint describes the possibility of future or continuing harm." (Rec. Doc. 9-2, at 10). Furthermore, Defendant states that Plaintiffs have acknowledged that in the past, "commemorative events occurred without interference" at the Buena Vista Cemetery. *Id.* at 11. However, Plaintiffs allege exactly the opposite. Plaintiffs do not deny that Defendant allowed their members to attend a Black History Month ceremony on Defendant's property in 2025, but they claim that obtaining consent to do so involved onerous restrictions and a filed-but-later-voluntarily-dismissed lawsuit against them. Further, Plaintiffs assert that their members were harassed and surveilled by the security firm hired by

Defendant during the event. At oral argument, defense counsel pointed out that Defendant has granted every request for access to the Buena Vista Cemetery site, and the Court acknowledges that as an accurate statement. However, this consent did not come "without interference."

Next, the parties in this matter have adverse legal interests concerning the Buena Vista Cemetery, and at one point, Defendant must have agreed because it filed an action against Inclusive Louisiana, among others, to determine the parties' legal rights. Moreover, the only questions remaining in the matter are legal ones, i.e., whether Plaintiffs have a legal right to access and maintain the Buena Vista Cemetery. Finally, this dispute could be resolved by a conclusive judgment issued by the Court. In other words, the Court finds that the issues in this matter are fit for judicial decision. Furthermore, Plaintiffs would continue to suffer a hardship if Defendant either denied future access to the site or continued to make each proposed visit a full-scale legal negotiation.

Finally, the Court does not understand how allowing Plaintiffs reasonable access to the Buena Vista Cemetery would pose a hardship to FG, especially considering that the cemetery is currently fenced off and not being used. As the Louisiana Supreme Court explained in *Humphreys*, "Instinctively [people] resent any rude invasion of, or approach to, ground set apart as a resting place for the dead. Deference to this sentiment and respect for the feelings of those who have deposited the remains of their relatives in burial fields usually restrain others from violating the sanctity of such places." *Humphreys*, 197 So. at 229. It seems that such

considerations would counsel in favor of granting reasonable access to Plaintiffs' members. In the absence of Defendant's consent, however, the Court concludes that Plaintiffs' claims are fit for judicial determination and that they would suffer continued hardship without judicial resolution.

**II. Motion to Dismiss for Failure to State a Claim**

Next, Defendant urges the Court to dismiss Plaintiffs' claims pursuant to Rule 12(b)(6) for failure to state a claim on which relief can be granted. First, Defendant contends that the Court should dismiss Plaintiffs' Thirteenth Amendment claim because the Thirteenth Amendment does not create a private cause of action, and therefore, "a plaintiff must proceed under an implementing statute." (Rec. Doc. 9-2, at 13 (citing *La. Acorn Fair Hous. v. Quarter House*, 952 F. Supp. 352, 357 (E.D. La. 1997))). Plaintiffs maintain, however, that "Formosa's ownership and control of the sacred remains and graves of people who died in slavery" constitute a literal and direct effect of slavery "that was never rectified after the Thirteenth Amendment entered into force." (Rec. Doc. 20, at 15). Accordingly, Plaintiffs explain that they bring their Thirteenth Amendment claim both directly under the Thirteenth Amendment and under an implementing statute, 42 U.S.C. § 1985(3).

Defendant accurately states the law concerning the Thirteenth Amendment. Indisputably, Congress has the authority under the Thirteenth Amendment's Enforcement Clause "rationally to determine what are the badges and the incidents of slavery" and "to translate that determination into effective legislation." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968). However, the Court knows of no case

in which the right to bring a claim directly under the Thirteenth Amendment has been recognized.

At the hearing on Defendant's motion to dismiss, Plaintiffs and Defendant presented compelling arguments on both sides of this issue. First, defense counsel raised doubts about a plaintiff's ability to bring a claim directly under the Thirteenth Amendment. Specifically, defense counsel asked why the drafters of the Amendment would have included Section 2, the Enforcement Clause that grants Congress the "power to enforce this article by appropriate legislation," if they intended for Section 1 to create a direct cause of action. U.S. Const. amend. XIII. Further, Defendant cited the Fifth Circuit's decision in *Channer v. Hall* to support its argument that the Thirteenth Amendment does not provide a stand-alone cause of action, but the court's holding in that matter is more nuanced than Defendant acknowledges. *Channer v. Hall*, 112 F.3d 214 (1997).

In *Channer*, a federal inmate and later Immigration and Naturalization Service ("INS") detainee brought a Thirteenth Amendment claim for involuntary servitude against the warden and other officers of the federal correctional institution where he was housed. *Id.* at 215. He alleged that the correctional officers subjected him to involuntary servitude after his criminal sentence ended but while he was still being detained by the INS. *Id.* The Fifth Circuit held that Channer had not been involuntarily forced into servitude, *id.* at 219, but in a footnote, the court stated that while a suit under Section 2 of the Thirteenth Amendment must be brought pursuant to a statute enacted by Congress, "suits attacking compulsory labor arise directly

under prohibition of § 1, which is 'undoubtedly self-executing without any ancillary legislation' and '[b]y its own unaided force and effect . . . abolished slavery, and established universal freedom,'" *id.* at 217 n.5 (quoting *The Civil Rights Cases,* 109 U.S. 3, 20 (1883)). This distinction between Section 1 and Section 2 is crucial. The Fifth Circuit definitively stated that to challenge the badges and incidents of slavery, a plaintiff must use an implementing statute; however, the court also made it clear that an individual may bring a cause of action related to compulsory labor and involuntary servitude directly under Section 1 of the Thirteenth Amendment.

The instant matter undoubtedly addresses a direct and lingering effect of the slavery system in the United States, and Plaintiffs argued compellingly that Defendant retains ownership and control of the people buried at the Buena Vista Cemetery even to this day. Ultimately, the Court agrees with Plaintiffs that "the cemeteries and the continuing inability of Plaintiffs to freely access, care for, and congregate at Buena Vista, are clear and direct 'burdens and incapacities [that] were [and are] the inseparable incidents of the institution' of slavery." (Rec. Doc. 20, at 17 (quoting *The C.R. Cases,* 109 U.S. at 22)). At the same time, the Court agrees with Defendant concerning Fifth Circuit precedent that any suit challenging the badges and incidents of slavery, and not forced labor, must be brought pursuant to an implementing statute. Accordingly, Plaintiffs may not bring their claim directly under the Thirteenth Amendment but must use an implementing statute instead.

In their opposition to Defendant's motion to dismiss, Plaintiffs point to an implementing statute, Section 1985(3), and claim that "the Complaint amply states

factual allegations demonstrating all of the elements of a § 1985(3) claim . . . ." *Id.* at 19. As Defendant asserts, however, Plaintiffs make only a cursory reference to § 1985 in the "Jurisdiction and Venue" section of the complaint. More importantly, the Court finds that Plaintiffs have not sufficiently alleged facts to establish the elements of a § 1985(3) claim. Section 1985 provides a cause of action for civil rights conspiracies that deprive a person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws. *See* 42 U.S.C. § 1985(3).

In *Hilliard v. Ferguson*, the Fifth Circuit explained the elements a plaintiff must allege to state a claim under § 1985(3): "(1) a conspiracy involving two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States." 30 F.3d 649, 652–53 (5th Cir. 1994). Plaintiffs' counsel acknowledged at oral argument that the complaint never uses the word "conspiracy," and while that is not technically required, the Court concludes that Plaintiffs did not allege sufficient facts to demonstrate the elements of a § 1985 claim. Accordingly, the Court finds that Defendant's motion to dismiss Plaintiffs' Thirteenth Amendment claim should be granted.

Plaintiffs' other claim arises under Louisiana law. Plaintiffs allege that this Court has jurisdiction based on federal question and also pursuant to 28 U.S.C. § 1332 "because there is diversity of citizenship among the parties and the amount in controversy exceeds $75,000.00." (Rec. Doc. 1, at 6). However, Plaintiffs seek

declaratory and injunctive relief that the Court concludes would not meet the amount in controversy required for diversity jurisdiction. Only if Plaintiffs are seeking a transfer of ownership of the property, which the Court cannot grant under the Thirteenth Amendment, would the amount in controversy exceed $75,000.00.

Therefore, the Court finds that federal question, and not diversity of citizenship, constitutes the valid basis for jurisdiction in this matter. Furthermore, the Court has found that Defendant's motion to dismiss Plaintiffs' Thirteenth Amendment claim should be granted. Without this federal question, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claim.

Based on the Court's decisions concerning Defendant's motion to dismiss under Rule 12(b)(6), it is unnecessary for the Court to reach Defendant's motion to dismiss pursuant to Rule 12(b)(7).

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's *Motion to Dismiss* **(Rec. Doc. 9)** is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' federal claim, arising under the Thirteenth Amendment, is **DISMISSED**, Plaintiffs are granted leave to file an amended complaint within twenty-one days of this order, upon failing to do so, the federal claims will be dismissed **with prejudice**.

**IT IS FURTHER ORDERED** that Plaintiffs' state law claim against Defendant is **DISMISSED**, **without prejudice**.

New Orleans, Louisiana, this 29th day of September, 2026.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE